UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

SHREVEPORT DIVISION

| | | |
|---|---|---|
| **JEREMIAH HARRIS** | * | **CIVIL ACTION NO. 12-1730** |
| **VERSUS** | * | **JUDGE TOM STAGG** |
| **CAROLYN W. COLVIN, ACTING COMMISSIONER, SOCIAL SECURITY ADMINISTRATION** | * | **MAG. JUDGE KAREN L. HAYES** |

## REPORT & RECOMMENDATION

Before the court is plaintiff's petition for review of the Commissioner's denial of social security disability benefits. The district court referred the matter to the undersigned United States Magistrate Judge for proposed findings of fact and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C). For the reasons assigned below, it is recommended that the decision of the Commissioner be **REVERSED and REMANDED for further proceedings.**

### Background & Procedural History

Jeremiah Harris filed the instant applications for Title II Disability Insurance Benefits and Title XVI Supplement Security Income payments on August 5, 2009. (Tr. 154-161). He alleged disability as of July 13, 2009, because he could not remember things, his speech was impaired, and because of lack of awareness. (Tr. 170, 194). The claims were denied at the initial stage of the administrative process. (Tr. 92-98). Thereafter, Harris requested and received a March 10, 2010, hearing before an Administrative Law Judge ("ALJ"). (Tr. 58-91). The ALJ also held a supplemental hearing on February 1, 2011, to afford Harris the opportunity to cross-examine consultative psychologist Robert Krenek, Ph.D., and vocational expert Joanie Cobb. (Tr. 34-57). In a March 7, 2011, written decision, however, the ALJ determined that Harris was not disabled

under the Act, finding at step five of the sequential evaluation process that he was able to make an adjustment to work that exists in substantial number in the national economy. (Tr. 9-26). Harris appealed the adverse decision to the Appeals Council. On April 20, 2012, however, the Appeals Council denied Harris's request for review; thus the ALJ's decision became the final decision of the Commissioner. (Tr. 1-3).

On June 18, 2012, Harris sought review before this court. He alleges the following errors,

1) The ALJ's residual functional capacity assessment is not supported by substantial evidence because a) he improperly assigned more weight to the opinion of a psychologist, Dr. Krenek, in lieu of the opinion of a neurosurgeon, Dr. Raul Cardenas; and b) new evidence regarding Harris's admission to a nursing home undermines the ALJ's finding that he was capable of caring for himself; and

2) had the ALJ endorsed a more restricted residual functional capacity assessment as advocated by Plaintiff, then it is manifest that he is unable to make an adjustment to any other work in the national economy, and a finding of disabled is required at step five of the sequential evaluation process.

## **Standard of Review**

This court's standard of review is (1) whether substantial evidence of record supports the ALJ's determination, and (2) whether the decision comports with relevant legal standards. *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990). Where the Commissioner's decision is supported by substantial evidence, the findings therein are conclusive and must be affirmed. *Richardson v. Perales*, 402 U.S. 389, 390 (1971). The Commissioner's decision is not supported by substantial evidence when the decision is reached by applying improper legal standards. *Singletary v. Bowen*, 798 F.2d 818 (5th Cir. 1986). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. at 401. Substantial evidence lies somewhere between a scintilla and a

preponderance. *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991). A finding of no substantial evidence is proper when no credible medical findings or evidence support the ALJ's determination. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988). The reviewing court may not reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).

### Determination of Disability

Pursuant to the Social Security Act ("SSA"), individuals who contribute to the program throughout their lives are entitled to payment of insurance benefits if they suffer from a physical or mental disability. *See* 42 U.S.C. § 423(a)(1)(D). The SSA defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). Based on a claimant's age, education, and work experience, the SSA utilizes a broad definition of substantial gainful employment that is not restricted by a claimant's previous form of work or the availability of other acceptable forms of work. *See* 42 U.S.C. § 423(d)(2)(A). Furthermore, a disability may be based on the combined effect of multiple impairments which, if considered individually, would not be of the requisite severity under the SSA. *See* 20 C.F.R. § 404.1520(a)(4)(ii).

The Commissioner of the Social Security Administration has established a five-step sequential evaluation process that the agency uses to determine whether a claimant is disabled under the SSA. *See* 20 C.F.R. §§ 404.1520, 416.920. The steps are as follows,

(1) An individual who is performing substantial gainful activity will not be found disabled regardless of medical findings.

(2) An individual who does not have a "severe impairment" of the requisite

3

    duration will not be found disabled.

 (3) An individual whose impairment(s) meets or equals a listed impairment in [20 C.F.R. pt. 404, subpt. P, app. 1] will be considered disabled without the consideration of vocational factors.

 (4) If an individual's residual functional capacity is such that he or she can still perform past relevant work, then a finding of "not disabled" will be made.

 (5) If an individual is unable to perform past relevant work, then other factors including age, education, past work experience, and residual functional capacity must be considered to determine whether the individual can make an adjustment to other work in the economy.

See *Boyd v. Apfel*, 239 F.3d 698, 704 -705 (5th Cir. 2001); 20 C.F.R. § 404.1520.

The claimant bears the burden of proving a disability under the first four steps of the analysis; under the fifth step, however, the Commissioner must show that the claimant is capable of performing work in the national economy and is therefore not disabled. *Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5 (1987). When a finding of "disabled" or "not disabled" may be made at any step, the process is terminated. *Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir. 1990). If at any point during the five-step review the claimant is found to be disabled or not disabled, that finding is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### The ALJ's Findings

**I. Steps One, Two, and Three**

  The ALJ determined at step one of the sequential evaluation process that Harris had not engaged in substantial gainful activity during the relevant period. (Tr. 14). At step two, he found that he suffers severe impairments of residuals of a stroke, hypertension, diabetes mellitus, cognitive disorder, and adjustment disorder. *Id*. He concluded, however, that the impairments were not severe enough to meet or medically equal any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4, at step three of the process. (Tr. 15-16).

## II. Residual Functional Capacity

The ALJ next determined that Harris retained the residual functional capacity to perform light work,[1] except that he is unable to drive automotive equipment, work around dangerous moving machinery, or at unprotected heights; with mild limitations in the ability to understand, remember and carry out simple instructions; mild limitations in the ability to make judgments on simple work-related decisions; moderate limitations in the ability to understand, remember, and carry out complex instructions; marked limitations in the ability to make judgments on complex work-related decisions, but only moderate limitations in the ability to make judgments on "detailed" decisions; moderate limitations in the ability to interact appropriately with co-workers, supervisors and the public; and marked limitations in the ability to respond appropriately to usual work situations and to changes in a routine work setting. (Tr. 16).

For purposes of the decision, "moderate" is defined as more than a slight limitation in this area, but the individual still is able to function satisfactorily. *Id*. "Marked" means "[t]here is serious limitation in this area. There is substantial loss in the ability to effectively function." *Id*.

---

[1] Light work entails:
> . . . lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

### III.     Steps Four and Five

The ALJ concluded at step four of the sequential evaluation process that Harris was unable to perform his past relevant work. (Tr. 23). Accordingly, he proceeded to step five. At this step, the ALJ determined that, as of the alleged disability onset date, Harris was an individual closely approaching advanced age. (Tr. 24). Transferability of skills was not material. *Id*. He then observed that given Harris's vocational factors, and if he were capable of the full range of light work, the Medical-Vocational Guidelines would direct a finding of not disabled. 20 C.F.R. § 404.1569; Rule 202.14, Table 2, Appendix 2, Subpart P, Regulations No. 4. *Id*. However, because Harris's residual functional capacity did not permit him to perform the full range of light work, the ALJ consulted a vocational expert ("VE") to determine whether, and to what extent his additional limitations eroded the occupational base for unskilled light work. In response, the VE identified the representative jobs of housekeeping cleaner, *Dictionary of Occupational Titles* ("DOT") Code # 323.687-014, and patch worker (agricultural/janitorial), DOT Code # 381.687-030, that were consistent with the ALJ's RFC and Harris's vocational profile. (Tr. 24-25).[2]

## Analysis

### I.     Residual Functional Capacity

a)     Chronology of Relevant Medical Evidence

Harris went to the emergency room on February 15, 2009 complaining of confusion that had started approximately one week earlier. (Tr. 235-258). His grip was equal bilaterally; he

---

[2] The VE testified that for the housekeeping cleaner job, there were 3,470 positions regionally and 223,124 positions nationally. (Tr. 24-25). For the patch worker job there were 3,102 such positions regionally and 236,494 nationally. (Tr. 24-25). This incidence of jobs constitutes a significant number of jobs in the "national economy." 42 U.S.C. § 423(d)(2)(A); *Johnson v. Chater*, 108 F.3d 178, 181 (8th Cir. 1997) (200 jobs at state level and 10,000 nationally, constitute a significant number).

was able to move all of his extremities; his gait was steady; speech was normal; but with a facial droop on the left side. *Id*. He had a full range of motion, with no evidence of weakness. (Tr. 240). However, his strength was 3/5 in the left arm and leg. *Id*. He was able to follow commands, but slow to respond. *Id*. Raj Gandhi, M.D., diagnosed acute right cerebrovascular accident, non-hemorrhagic infarct in subcortical area; possible severe infarct on old infarct on left side; mild hypertension; diabetes mellitus, type II, insulin-dependent, uncontrolled; hyperlipidemia; and possible seizure. *Id*. Neurologically, Harris had left facial weakness and minimal weakness and strength.

On February 17, 2009, Harris's motor strength was 5/5 in the upper and lower extremity. (Tr. 249). On February 20, 2009, he was discharged from the hospital with diagnoses of acute right cerebrovascular accident; possible severe infarct on old infarct on the left side; hypertension; diabetes mellitus; and hyperlipidemia. (Tr. 253).

At the request of the state agency, Harris underwent a September 8, 2009, consultative examination with Raul Cardenas, M.D. (Tr. 259-262). Harris explained to Cardenas that he had suffered a stroke in February 2009. *Id.* Cardenas noted that Harris was somewhat hard to communicate with. *Id.* Harris reported that his left-sided weakness had improved over time. *Id.* Harris's wife stated, however, that she had to take care of him like a child. *Id.* She explained that his troubles appeared to be more volitional than executional in origin. *Id.* Harris denied incontinence. *Id.* He also denied mood changes, depression, or difficulty concentrating. *Id.* He ambulated without assistance, with a slight left-sided limp. *Id.* He admitted to weakness on the left side. *Id.* Cardenas noted that Harris was able to rise from a sitting position, without assistance, stand on tiptoes, heel and tandem walk without problem. *Id.* He was able to bend and squat, without difficulty. *Id.* He had 4/5 grip strength on the left side and 5/5 strength on the

right.  *Id*.  He demonstrated adequate fine motor movements, dexterity, and ability to grasp objects bilaterally.  *Id.*  He was alert and oriented to time, place, and situation.  *Id.*  He appeared abulic, but not depressed.  *Id.*  He was able communicate with no deficits.  *Id.*  Recent memory was intact, but remote memory was deficient.  *Id.*  Harris obtained a good result on the mini-mental status examination.  *Id.*  However, he was unable to remember and repeat objects at three minutes; unable to perform serial 7 subtractions, and unable to construct a sentence or follow all commands.  *Id.*  He had 5/5 strength on the right and 4+/5 on the left in all muscle groups.  *Id.*  Cardenas diagnosed "S/p R centrum semiovale stroke;" hypertension; and Type II Diabetes Mellitus.  *Id.*

      Cardenas concluded that based on the examination and objective evidence, Harris suffered an ischemic insult to his brain in February 2009, and was still convalescing from the event.  *Id*.  Cardenas opined that at the time of the examination, Harris was unable to walk and/or stand for a full work day, nor able to lift/carry objects.  *Id.*  Although he was able to hold a conversation and respond appropriately to questions, his ability to carry out and remember instructions was questionable.  *Id.*  Harris retained the use of his hands for fine motor skills, and was able to sit for a workday.  *Id*.  Cardenas stated, however, that Harris's short term memory remained deficient, and his usefulness in the workplace was "null."  *Id.*  Nevertheless, Harris's prognosis was hopeful.  *Id*.  Cardenas believed that most of his limitations could be overcome with intensive cognitive and physical therapy, with optimal medical management of his existing medical conditions over the next six months.  *Id.*  He recommended a repeat evaluation at the end of that period to appraise the progress.  *Id.*

      In the wake of Dr. Cardenas's report, a non-examining agency physician, Edward Dean, M.D., endorsed an RFC for light work, which was prepared and signed by an agency disability

examiner. (Tr. 264-265, 292-299).

At the request of the state agency, Harris underwent an October 19, 2009, evaluation with consultative neuro-psychologist James Pinkston, Ph.D. (Tr. 268-272). At the beginning of the evaluation, Pinkston observed that Harris walked slowly, but by the end, he did not discern any motor deficits or difficulties with ambulation. *Id*. Harris's performance on measures sensitive for sub-optimal effort fell below normal limits. *Id.* Moreover, he did not consistently appear to work to the best of his ability. *Id.* Harris's responses were notable for excessive response latencies, inconsistency across similar measures, and inconsistency with his general presentation. *Id.* Consequently, the testing results likely did not accurately reflect Harris's mental status and memory functioning. *Id*. The results also likely contained exaggerations of any noted deficits and had to be interpreted cautiously. *Id.* Pinkston considered Harris to be an unreliable informant. *Id*.

According to Pinkston, Harris reported that his whole left side was paralyzed – he could move it but it felt funny. *Id.* He did not take medication, and had not received any treatment. *Id*. He reported that he could cook, make his bed, vacuum, bathe, and dress himself. *Id.* He made scrambled eggs, bacon, and toast for breakfast. *Id.* He did not need help remembering to take his medication. *Id.* He noted that he had friends, and made them easily. *Id.* He did not have difficulty completing tasks on time. *Id.* His speech and thought processes appeared slow. *Id.* He was well-oriented, and able to sustain sufficient concentration during the evaluation. *Id.* His level of intellectual functioning appeared below average. *Id.* Moreover, he appeared able to make independent decisions, with the ability to manage his funds independently. *Id.*

Upon administration of the MMSE, Harris's score reflected modest restriction. *Id.* His results on the Wechsler Memory Scale -Third Edition also were not consistent with significant

organic memory impairment. *Id*. Pinkston assigned a Global Assessment of Functioning ("GAF") score of 70. *Id*.[3] Pinkston opined that the findings failed to "demonstrate a valid or reliable evidence for mental status or memory functioning caused restrictions in his ability to engage in substantially gainful activity." *Id*. Pinkston's finding was based on ample evidence for restricted effort during the assessment including his performance on measures sensitive to sub-optimal effort, excessive response latencies, inconsistencies across similar measures, and inconsistencies between his test results and his general presentation. *Id*. Pinkston recommended that Harris be referred to vocational rehabilitation services to increase his job-related skills. *Id*.

Based on Harris's sub-optimal effort at the consultative mental examination, a non-examining agency psychologist, Tom Ray, Ph.D., signed a psychiatric review technique on October 28, 2009, finding insufficient evidence to support a mental impairment. (Tr. 277-291).

On May 22, 2010, Harris underwent another consultative psychological examination, this time with Robert Krenek, Jr., Ph.D. (Tr. 300-304). According to Krenek's report, Harris stated that he had started feeling depressive symptoms because of his inability to do things since the stroke. *Id*. His activity level was slowed, but he walked without support. *Id*. Posture was within normal limits. *Id*. Krenek remarked that Harris did not appear to display his best effort on all test items. *Id*. Harris was able to obey simple commands such as "raise your arm," and read simple sentences, such as "close your eyes." *Id*. He was able to carry on a conversation without

---

[3] "GAF is a standard measurement of an individual's overall functioning level 'with respect only to psychological, social, and occupational functioning.'" *Boyd*, 239 F.3d at 701 n2 (citing AMERICAN PSYCHIATRIC ASS'N DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS at 32 (4th ed. 1994) (*DSM-IV*)). A GAF score of 61-70 indicates "**[s]ome mild symptoms** (e.g., depressed mood and mild insomnia) **OR some difficulty in social occupational, or school functioning** (e.g., occasional truancy, or theft within the household), **but generally functioning pretty well, has some meaningful interpersonal relationships**." *DSM-IV*, pg. 32.

significant difficulty.  *Id.*  His mood was predominantly depressed.  *Id.*  Harris showed no formal signs of a thought disorder during the examination.  *Id.*  Thinking was intact, logical, and coherent.  *Id.*  He was oriented to time, place, person, and situation.  *Id.*  Recent and remote memory appeared to be intact.  *Id.*  He did not give his best effort on short-term auditory memory.  *Id.*  His performance during the evaluation was significantly lower than his performance during the evaluation with Dr. Pinkston.  *Id.*  His concentration was intact on very simple vigilance tasks.  *Id*.  Concentration was difficult to assess, however, because Harris gave up easily and provided near miss responses.  *Id.*  Persistence was inconsistent.  *Id*.  Also, his activities of daily living checklist was inconsistent with the report he provided in October 2009.  *Id*.  His level of functioning had significantly decreased.  *Id.*  Harris's performance during the evaluation suggested that he needed a guardian to help him manage his funds.  *Id.*  Because of his responses to the testing, his WAIS-IV scores were considered invalid  *Id.*

Krenek diagnosed cognitive disorder, NOS (provisional); adjustment disorder with depressed mood, chronic.  *Id.*  However, Harris showed no formal signs of a thought disorder during the examination.  *Id.*  Assessment data suggested that his capacity to perform work-related task was impacted by the stroke.  *Id.*  Furthermore, assessment data indicated that Harris should be able to perform at least low level unskilled job tasks with adequate training and supervision.  *Id.*

Pursuant to the evaluation, Krenek completed a medical source statement of ability to do work-related activities (Mental).  (Tr. 305-307).  He indicated that Harris was mildly limited in his ability to understand, remember, and carry out simple instructions, and in his ability to make judgments on simple work-related decisions.  *Id.*  He was moderately limited in his ability to understand, remember, and carry out complex instructions, as well as in his ability to interact

appropriately with the public, supervisors, and co-workers. *Id.* He was markedly limited in his ability to make judgments on complex work-related instructions, and in his ability to respond appropriately to usual work situations and to changes in a routine work setting. *Id.* Krenek noted that Harris might need a guardian to manage large amounts of funds. *Id.*

      b)    <u>Discussion</u>

In his decision, the ALJ reviewed the available evidence, including the hearing testimony, the February 2009 hospitalization, the findings of the consultative neurosurgeon, the assessment of the disability examiner, and the opinions of the consultative psychologists. He noted that no treating or consulting physician had concluded that Harris was totally disabled. (Tr. 21). Furthermore, no treating physician had imposed any work-related functional limitations as a result of Harris's impairments. *Id*.

As for Harris's mental health, the ALJ resolved the apparent conflict between Dr. Cardenas and the two psychologists in favor of the psychologists because they were mental health professionals. (Tr. 22). He noted that Dr. Cardenas's assessment was early in the recuperative process, and that Harris had improved by the time he saw Dr. Krenek. *Id*. Accordingly, the ALJ assigned significant weight to Dr. Krenek's findings. (Tr. 22).

Plaintiff maintains that the ALJ erred in his resolution of the conflicting medical opinions. Toward this end, Plaintiff's counsel obtained a supplemental hearing to cross-examine Dr. Krenek. At the supplemental hearing, Krenek conceded that a neurosurgeon would be better suited to evaluate someone who had suffered a stroke. (Tr. 38-39). He also agreed that, in terms of physiology, the neurosurgeon would be much more qualified than a psychologist. *Id*.

"'[T]he ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion.'" *Martinez v. Chater*, 64 F.3d 172, 175-76 (5th Cir.1995) (citation

omitted). However, an ALJ cannot reject a medical opinion without an explanation supported by good cause. *See Loza v. Apfel*, 219 F.3d 378, 395 (5th Cir.2000) (citations omitted).

In this case, the ALJ purported to discount Dr. Cardenas's statements regarding Plaintiff's mental health on the grounds that Cardenas was not a mental health professional, and because Plaintiff's condition improved between the time of Cardenas's examination and when Krenek saw him. This rationale is not supported by the record, however. As recited above, Krenek conceded that Cardenas's specialty was better-suited to assess the effects of Plaintiff's stroke. Furthermore, according to Krenek, Harris's test results had worsened, rather than improved, since the time of Pinkston's examination which was held but one month after Cardenas's examination.

Having said that, the court further observes that the only portion of Dr. Cardenas's report that arguably conflicts with Dr. Krenek's findings is Cardenas's statement that "but as mentioned before, his short term memory is still deficient and his usefulness in the workplace would be null." (Tr. 261). Dr. Cardenas, however, did not quantify the degree of impairment in terms of functional loss. Instead, he simply concluded that Harris's usefulness in the workplace would be null. This expression is analogous to a statement that the claimant is disabled or unable to work, which does not constitute a medical opinion, and therefore, is afforded no special significance under the regulations. 20 C.F.R. § 404.1527(e); *see also Frank v. Barnhart*, 326 F.3d 618, 620 (5th Cir. 2003). Cardenas's statement regarding Plaintiff's usefulness in the workplace strays outside his area of expertise and into the realm of the vocational expert. The role of the medical expert is to render an opinion regarding the functional limitations caused by the claimant's impairments. Because Dr. Cardenas did not quantify Harris's degree of loss, his report is not irreconcilable with the findings of Drs. Pinkston and Krenek. However, because this matter is being reversed on other grounds, *see* discussion, *infra*, the ALJ may explore this issue on

13

remand.[4]

Although no more than obliquely raised by Plaintiff,[5] the court cannot overlook that portion of Dr. Cardenas's report in which he opined that Harris was unable to walk and/or stand for a full work day or lift/carry objects. (Tr. 261). While Dr. Cardenas did not precisely quantify the degree of limitation, the significant exertional demands of light work appear to exceed the restrictions imposed by Cardenas. The ALJ recognized this conflict, but stated that Cardenas's opinion was not well-supported by the remaining record. (Tr. 22). The ALJ noted that Harris had not reported significant limitations in his ability to stand/walk, and initially sought disability on the grounds of memory loss and other mental deficits. (Tr. 22).

The court observes, however, that Plaintiff may have omitted his physical limitations from disability application because his prior job, as he actually performed it, did not require any significant walking, standing, or lifting. *See* Tr. 195. In any event, Plaintiff stated on his functional report that he had very little feeling in left arm and leg, and that he could only walk for less than half of one block before needing to rest. (Tr. 175, 179).

The ALJ further downplayed the severity of Harris's stroke because of his failure to seek treatment to improve his ability to function. (Tr. 21). However, there is no evidence that the hospital prescribed treatment that Harris failed to follow, or that treatment was available to someone with Harris's means. Moreover, Plaintiff's condition did not improve with time. At the hearing, Plaintiff testified that he could only lift a few pounds with his left arm. (Tr. 71-72). He

---

[4] Some potential approaches include re-contacting Dr. Cardenas to see whether he agrees with Dr. Krenek's medical source statement, sending Harris for another consultative examination with a psychiatrist or neuro-psychiatrist, or by positing interrogatories to a neuropsychiatrist to discern whether the discrepancies observed by Krenek and Pinkston could be explained by the effects of Harris's stroke, or whether, he was purposefully trying to manipulate the test results.

[5] *See* Pl. Brief, pg. 3 (highlighting exertional limitations recognized by Dr. Cardenas).

also suffered weakness in his left leg. (Tr. 72-73). Further, his leg weakness prevented him from standing long or walking long distances. (Tr. 75-76).

In lieu of the limitations imposed by Dr. Cardenas, the ALJ purported to ground his RFC on the bases of the ALJ's own appreciation of the effects of the stroke suffered by Plaintiff, which coincided with the limitations imposed by the non-examining agency physician, as documented by the state agency disability examiner. (Tr. 22). It is manifest, however, that "an ALJ may properly rely on a non-examining physician's assessment when . . . those findings are based upon a careful evaluation of the medical evidence and *do not contradict those of the examining physician*." *Carrier v. Sullivan*, 944 F.2d 243, 246 (5th Cir.1991) (quoting, *Villa v. Sullivan,* 895 F.2d 1019,1024 (5th Cir. 1990)) (emphasis added).[6] Here, Dr. Dean's findings (as implemented via the disability examiner) admittedly contradict, *see* Tr. 298, the findings of the examining physician, Dr. Cardenas, and thus do not provide substantial support for the ALJ's determination.

Of course, the absence of a valid medical source statement describing the remaining functional abilities of the claimant does not, in, and of itself, render the record incomplete. *Ripley v. Chater*, 67 F.3d 552, 557-558 (5th Cir. 1995). In *Ripley*, as here, the Commissioner

---

[6] Also, a non-examining physician's opinion does not provide good cause for an ALJ to discount the findings of an examining physician. *See Lamb v. Bowen*, 847 F.2d 698, 703 (11th Cir. 1988) (addressing ALJ's reliance upon non-examining physician's opinion to discount findings of treating physician). The Fifth Circuit cited *Lamb* for the proposition that the reports of non-examining physicians do not provide substantial evidence when the non-examining physician's medical conclusions "contradict or are unsupported by findings made by an examining physician." *Villa, supra* (citing, *Lamb, supra*; and *Strickland v. Harris*, 615 F.2d 1103, 1109-10 (5th Cir. 1980)).
    The ALJ's decision to favor Dr. Dean's assessment (as carried out by the disability examiner), also transgresses, without explanation, the maxim that the opinions of specialists are generally accorded greater weight than those of non-specialists. *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990).

argued that the medical evidence substantially supported the ALJ's decision. *Ripley, supra*. The Commissioner pointed to medical reports discussing the extent of plaintiff's injuries, including a four year history of back troubles. *Id*. However, without reports from qualified medical experts, the Fifth Circuit could not conclude that the evidence substantially supported the ALJ's residual functional capacity assessment because the court was unable to determine the "effects of [plaintiff's] conditions, no matter how 'small.'" *Id*. The only evidence that described plaintiff's ability to work was plaintiff's own testimony, which, when read in proper context, failed to support the ALJ's residual functional capacity assessment. *Id*.

The instant case is materially indistinguishable from *Ripley, supra*. It is apparent that the ALJ usurped the role of the sole examining physician, and instead autonomously derived the exertional component of Plaintiff's RFC. Moreover, the record otherwise is bereft of a *cognizable* medical source statement that supports the ALJ's RFC. Certainly, Plaintiff's own testimony was not consistent with an RFC for a reduced range of light work. *See* discussion, *supra*. Under these circumstances, the court is compelled to find that the ALJ's assessment is not supported by substantial evidence. *See Williams v. Astrue*, 2009 WL 4716027 (5th Cir. Dec. 10, 2009) (unpubl.) ("an ALJ may not rely on his own unsupported opinion as to the limitations presented by the applicant's medical conditions"); *Ripley, supra* (substantial evidence lacking where: no medical assessment of claimant's residual functional capacity, and claimant's testimony was inconsistent with ALJ's assessment); *Butler v. Barnhart*, Case Number 03-31052 (5th Cir. 06/02/2004) (unpubl.) (in the absence of medical opinion or evidence establishing that the claimant could perform the requisite exertional demands, the ALJ's determination is not supported by substantial evidence).

**Conclusion**

In sum, because the foundation for the Commissioner's step five determination was premised upon a residual functional capacity that is not supported by substantial evidence, the court further finds that the Commissioner's ultimate conclusion that Plaintiff is not disabled, also is not supported by substantial evidence.[7]

For the above-stated reasons,

IT IS RECOMMENDED that the Commissioner's decision be REVERSED and REMANDED pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings consistent herewith.[8]

Under the provisions of 28 U.S.C. §636(b)(1)(C) and FRCP Rule 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of

---

[7] The court need not consider Plaintiff's additional arguments. These issues may be addressed upon remand. In particular, Plaintiff's admission to a nursing home may require consideration for disability at step three of the sequential evaluation process.

[8] Plaintiff urges the court to reverse with instructions to award benefits. The courts have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. §405(g). When reversal is warranted, the matter is remanded with instructions to make an award only if the record enables the court to conclusively determine that the claimant is entitled to benefits. *See, Ferguson v. Heckler*, 750 F.2d 503, 505 (5th Cir. 1985); *see also*, *Rini v. Harris*, 615 F.2d 625, 627 (5th Cir.1980) (reversing and remanding with direction to enter judgment where the evidence was not substantial and the record clearly showed the claimant's right to benefits). The instant record is not so disposed. Issues remain regarding Plaintiff's RFC. Further development of the record ultimately may support an RFC that does not compel a finding of disability.

filing. Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED in chambers at Monroe, Louisiana, this 22nd day of July 2013.

KAREN L. HAYES
U. S. MAGISTRATE JUDGE